No. 25-6714

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EVA LIGHTHISER, et al.,
*Plaintiffs-Appellants*

v.

DONALD J. TRUMP, et al.,
*Defendants-Appellees*

Appeal from the United States District Court
for the District of Montana
No. 2:25-cv-00054 (Hon. Dana L. Christensen, J.)

**DEFENDANTS-APPELLEES' ANSWERING BRIEF**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney
General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

CHRISTOPHER ANDERSON
MICHAEL SAWYER
MIRANDA JENSEN
JOHN K. ADAMS
JACOB D. ECKER
*Attorneys for Defendants*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................i

TABLE OF AUTHORITIES........................................................................iii

INTRODUCTION....................................................................................... 1

STATEMENT OF JURISDICTION........................................................... 3

STATEMENT OF THE ISSUES................................................................ 3

PERTINENT STATUTES AND REGULATIONS ................................... 4

STATEMENT OF THE CASE .................................................................. 4

I.      The Executive Orders.................................................................... 4

II.    Plaintiffs' Lawsuit ........................................................................ 7

III.   Proceedings Below........................................................................ 9

SUMMARY OF ARGUMENT ................................................................ 14

STANDARD OF REVIEW...................................................................... 17

ARGUMENT ........................................................................................... 18

I.     Plaintiffs lack Article III standing to challenge the President's government-wide policy directives. ........................... 18

     A.    The Court should reject Plaintiffs' novel theory that they are injured by every additional ton of greenhouse gas emissions. .................................................. 19

     B.    The climate harms Plaintiffs allege are not traceable to the executive orders they challenge. ...............24

     C.    A favorable ruling cannot redress Plaintiffs' alleged injuries..................................................................29

i

   1. An injunction against the executive orders and their implementation will not provide redress and is beyond the judicial power. ...................30

   2. Declaratory relief cannot redress Plaintiffs' injuries and is beyond the Court's power. ...................52

  D. Plaintiffs' ultra vires claims call for the same redressability analysis. ........................................................63

II. Plaintiffs fail to state a claim upon which relief can be granted. ...............................................................................68

III. The district court did not abuse its discretion in declining leave to amend...............................................................74

CONCLUSION .................................................................................75

Form 8. Certificate of Compliance for Briefs...........................................76

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................ 40, 41

*Am. Electric Power Co. v. Connecticut,*
  564 U.S. 410 (2011) ................................................................ 21, 22

*Animal Legal Def. Fund v. Dep't of Agric.,*
  935 F.3d 858 (9th Cir. 2019) ........................................................ 67

*Appalachian Voices v. EPA,*
  2025 WL 2494905 (D.D.C. Aug. 29, 2025) ........................................ 49

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ................................................................... 41

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................... 18

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................... 68

*Bldg. & Const. Trades Dep't v. Allbaugh,*
  295 F.3d 28, 32 (D.C. Cir. 2002) ................................................ 37, 54

*California v. Texas,*
  593 U.S. 659 (2021) ........................................................... 57, 58, 61

*Carrico v. City & Cnty. of San Francisco,*
  656 F.3d 1002 (9th Cir. 2011) ....................................................... 75

*City of New York v. Chevron Corp.,*
  993 F.3d 81 (2nd Cir. 2021) .......................................................... 70

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................... 25, 35

*Ctr. for Biological Diversity v. Dep't of the Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ............................... 19, 20, 27, 33, 34

iii

*Dalton v. Specter,*
511 U.S. 462 (1994) ........................................................ 71

*DeShaney v. Winnebago County Department of Soc. Services,*
489 U.S. 189 (1989) ........................................................ 73

*Diamond Alt. Energy, LLC v. Env't Prot. Agency,*
606 U.S. 100 (2025) .................................... 22, 55, 61, 62

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ........................................................ 69

*Duke Power Co. v. Carolina Env't Study Grp., Inc.,*
438 U.S. 59 (1978) ........................................................ 58

*Franklin v. Mass.,*
505 U.S. 788 (1992) ........................................................ 59

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .................................................. 18, 19

*Fed. Election Comm'n v. Akins,*
524 U.S. 11 (1998) ........................................................ 66

*Fed. Express Corp. v. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) ........................................ 72

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*
(TOC), Inc., 528 U.S. 167 (2000) ........................ 14, 20, 21

*Gill v. Whitford,*
585 U.S. 48 (2018) ........................................................ 65

*Gordon v. City of Oakland,*
627 F.3d 1092 (9th Cir. 2010) ........................................ 75

*Guaranty Tr. Co. v. York,*
326 U.S. 99 (1945) ........................................................ 36

*Haaland v. Brackeen,*
599 U.S. 255 (2023) .................................... 54, 57, 59, 63

*Hernandez v. City of San Jose,*
897 F.3d 1125 (9th Cir. 2018) ........................................ 74

iv

*In re Google Play Store Antitrust Litig.*,
  147 F.4th 917 (9th Cir. 2025) ..................................................... 47, 48

*Indep. Towers of Washington v. Washington*,
  350 F.3d 925 (9th Cir. 2003) ........................................................... 64

*Ingraham v. Wright*,
  430 U.S. 651 (1977) ......................................................................... 70

*Johnson v. Riverside Healthcare Sys., LP*,
  534 F.3d 1116 (9th Cir. 2008) ......................................................... 68

*Juliana v. United States*,
  947 F.3d 1159 (9th Cir. 2020) ................................................... passim

*Kennedy v. City of Ridgefield*,
  439 F.3d 1055 (9th Cir. 2006) ......................................................... 74

*Kennedy v. City of Ridgefield*,
  440 F.3d 1091 (9th Cir. 2006) ......................................................... 73

*Kirola v. City & Cnty. of San Francisco*,
  860 F.3d 1164 (9th Cir. 2017) ......................................................... 47

*L.W. v. Grubbs*,
  974 F.2d 119 (9th Cir. 1992) ........................................................... 74

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................................. 38

*Louisiana ex rel. Landry v. Biden*,
  64 F.4th 674 (5th Cir. 2023) ........................................................... 26

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................... passim

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ......................................................................... 51

*M.S. v. Brown,*
902 F.3d 1076 (9th Cir. 2018) .......................................... 15, 29,43, 52

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ...................................................... 19, 28, 33, 62

*Maxwell v. County of San Diego,*
708 F.3d 1075 (9th Cir. 2013) ....................................................... 74

*Maya v. Centex Corp.,*
658 F.3d 1060 (9th Cir. 2011) ....................................................... 24

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC,*
571 U.S. 191 (2014) ...................................................................... 57

*Mendia v. Garcia,*
768 F.3d 1009 (9th Cir. 2014) ....................................................... 28

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ................................................................. 70, 71

*Missouri v. Biden.*
52 F.4th 362 (8th Cir. 2022) .......................................................... 26

*Missouri v. Jenkins,*
515 U.S. 70 (1995) ....................................................................... 39

*Murthy v. Missouri,*
603 U.S. 43 (2024) .................................................................. 21, 33

*Myers v. United States,*
272 U.S. 52 (1926) .................................................................. 37, 54

*N. Cnty. Cmty. All., Inc. v. Salazar,*
573 F.3d 738 (9th Cir. 2009) .................................................... 17, 18

*New York v. Trump,*
2025 WL 3514301 (D. Mass. Dec. 8, 2025) ..................................... 49

*Norton v. Southern Utah Wilderness Alliance,*
542 U.S. 55 (2004) ....................................................................... 51

*Nuclear Regal. Comm'n v. Texas,*
605 U.S. 665 (2025) ................................................................. 71, 72

vi

*Obergefell v. Hodges,*
135 S. Ct. 2584 (2015) ...................................................................... 70

*Osborn v. Bank of U.S.,*
22 U.S. 738 (1824) ............................................................................ 42

*Panama Refin. Co. v. Ryan,*
293 U.S. 388 (1935) .......................................................................... 42

*Pauluk v. Savage,*
836 F.3d 1117 (9th Cir. 2016) .................................................... 73, 74

*Penilla v. City of Huntington Park,*
115 F.3d 707 (9th Cir. 1997) ........................................................... 74

*Pharmaceutical Research & Manufacturers of America. v. Stolfi*
153 F.4th 795 (9th Cir. 2025) ......................................................... 60

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) .......................................................................... 35

*Quebec v. Bonta,*
33 F.4th 1107 (9th Cir. 2022) ......................................................... 60

*Reno v. Flores,*
507 U.S. 292 (1998) .......................................................................... 72

*Revolution Wind, LLC v. Burgum,*
2026 WL 113568 (D.D.C. Jan. 12, 2026) ......................................... 49

*Rutman Wine Co. v. E. & J. Gallo Winery,*
829 F.2d 729 (9th Cir. 1987) ........................................................... 18

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union,*
65 F.4th 1012 (9th Cir. 2023) ......................................................... 57

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) .......................................................................... 18

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ............................................................................ 45

*Steffel v. Thompson,*
415 U.S. 452 (1974) .......................................................................... 55

vii

*Sterling v. Constantin,*
287 U.S. 378 (1932) ................................................................ 42

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ................................................................ 21

*Trump v. Am. Fed'n of Gov't Emps.,*
145 S. Ct. 2635 (2025) ........................................................... 38

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ..................................................... 16, 35, 36

*United States v. Orozco-Acosta,*
607 F.3d 1156 (9th Cir. 2010) ............................................... 27

*Utah v. Evans,*
536 U.S. 452, 464 (2002) ....................................................... 59

*Uzuegbunam v. Preczewski,*
592 U.S. 279 (2021) ............................................................... 60

*Vacco v. Quill,*
521 U.S. 793, (1997) .............................................................. 70

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*
529 U.S. 765 (2000) ............................................................... 36

*Wash. Env't Council v. Bellon,*
732 F.3d 1131 (9th Cir. 2013) .......................................... passim

*Washington v. Glucksberg,*
521 U.S. 702 (1997) (plurality opinion) ............................... 69

*Washington v. Trump,*
145 F.4th 1013 (9th Cir. 2025) ............................................. 44

*Wilderness Soc., Inc. v. Rey,*
622 F.3d 1251 (9th Cir. 2010) ......................................... 66, 67

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ............................................................... 41

**Constitutional Provisions**

U.S. CONST. art. III, § 1 ............................................................... 35

**Statutes**

5 U.S.C. § 701 ........................................................................... 3

5 U.S.C. § 702 ......................................................................... 37

5 U.S.C. § 704 ......................................................................... 37

5 U.S.C. § 706 .................................................................... 37, 67

42 U.S.C. § 7607(b)(1) ............................................................. 37

16 U.S.C. § 1600 ...................................................................... 3

15 U.S.C. § 2931 ..................................................................... 67

15 U.S.C. § 2931(b) ................................................................. 67

15 U.S.C. § 2933 ..................................................................... 67

15 U.S.C. § 2936 ..................................................................... 67

16 U.S.C. § 1531 ...................................................................... 3

50 U.S.C. § 1601 ...................................................................... 6

42 U.S.C. § 4321 ...................................................................... 3

28 U.S.C. § 1291 ...................................................................... 3

28 U.S.C. § 1331 ...................................................................... 3

28 U.S.C. § 2201 ..................................................................... 56

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) ......................... 3

Federal Rule of Civil Procedure 12(b)(1) .................................. 18

Federal Rule of Civil Procedure 12(b)(6) ...................................... 18, 68

**Other Authorities**

Executive Order 14154, *Unleashing American Energy*,
  90 Fed. Reg. 8353 (Jan. 20, 2025); ............................................. passim

Executive Order 14156, *Declaring a National Energy Emergency*
  (*Energy Emergency*), 90 Fed. Reg. 8433 (Jan. 20, 2025) ............. passim

  Executive Order 14261, *Reinvigorating America's Beautiful Clean*
  *Coal Industry and Amending Executive Order 14241*,
  90 Fed. Reg. 15517 (Apr. 14, 2025)............................................. passim

x

## INTRODUCTION

Plaintiffs, a group of children and young adults, challenge the President's authority to direct energy policy within the Executive Branch. The President has directed administrative agencies, consistent with their statutory authority, to unleash American energy production. The children and young adults would rather courts direct the Executive Branch's energy policy. Asserting a substantive due process right to their preferred global atmospheric concentrations of greenhouse gases, Plaintiffs ask this Court for an injunction that would essentially superintend the energy policy of the United States.

The youths' case is policy advocacy masquerading as litigation and is well outside the limitations of Article III. This Court held as much in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020). Applying *Juliana* and bedrock Article III doctrine, the district court here correctly dismissed Plaintiffs' complaint because they lack standing.

Congress has delegated extensive authority to the Executive Branch related to National energy policy, including producing, transporting, and burning hydrocarbons (sometimes called fossil fuels). The President, as head of the Executive Branch has—like his

1

predecessors—directed agencies under his supervision to exercise that discretion in ways consistent with his Administration's policy priorities when applicable law allows. Portions of the President's policy priorities and supervisory direction are expressed in the three executive orders challenged here, all of which aim to promote energy from hydrocarbons and other sources like hydropower, geothermal, biofuels, and nuclear.

In asking for declaratory and injunctive relief against the President's executive orders, the youths ask the federal courts to micromanage the President's policy choices. But Congress has delegated those discretionary policy choices to the Executive Branch, and the President, as head of the Executive Branch, properly directs the exercise of that discretion.

Plaintiffs' claims also fail on the merits. Plaintiffs say that the President's policy guidance violates their rights under the Due Process Clause, the separation of powers, the Take Care Clause, and the Presentment Clause. The substantive due process right that plaintiffs invoke does not exist. The executive orders are not ultra vires. And the state-created danger doctrine does not apply.

This Court should affirm.

2

## STATEMENT OF JURISDICTION

(a)　The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff' allege claims under federal law. *See* 5 U.S.C. § 701 et seq.; 16 U.S.C. § 1531 et seq.; 42 U.S.C. § 4321 et seq.; 16 U.S.C. § 1600 et seq.; 6-ER-1314-38. As explained below, the district court lacked Article III jurisdiction.

(b)　This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment resolving all Plaintiffs' claims against all Defendants. 1-ER-3.

(c)　The judgment was entered on October 14, 2025. 1-ER-3. Plaintiffs filed a notice of appeal on October 20, 2025. 6-ER-1392. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Do plaintiffs have standing to assert constitutional challenges to the President's general policy directions and thereby enlist the courts in evaluating the wisdom of discretionary policy judgments untethered from the legality of the rulemakings and other regulatory actions that implement the President's priorities?

3

2. In the alternative, do Plaintiffs state a claim for relief against the executive orders?

3. Did the district court abuse its discretion when it denied Plaintiffs' request for leave to amend their complaint?

## PERTINENT STATUTES AND REGULATIONS

Pertinent provisions are included in the Addendum attached to Plaintiffs' opening brief.

## STATEMENT OF THE CASE

### I.      The Executive Orders

Plaintiffs challenge three executive orders: (1) Executive Order 14154, Unleashing American Energy, 90 Fed. Reg. 8353 (Jan. 20, 2025); (2) Executive Order 14156, Declaring a National Energy Emergency (Energy Emergency), 90 Fed. Reg. 8433 (Jan. 20, 2025); and (3) Executive Order 14261, Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241 (Clean Coal), 90 Fed. Reg. 15517 (Apr. 8, 2025). 6-ER-1257-72. The three challenged executive orders set energy policy for the Executive Branch and direct federal agencies to implement that policy "in a manner consistent with

applicable law[.]" 90 Fed. Reg. at 8359; 90 Fed. Reg. at 15519; 90 Fed. Reg. at 8437.

Section 1 of Unleashing American Energy is a background section that determines it is "in the national interest to unleash America's affordable and reliable energy and natural resources." 90 Fed. Reg. at 8353. Section 2 sets broad policy goals, including promoting energy exploration and production, safeguarding consumer choice, and creating jobs and prosperity. *Id.* at 8353-54. Section 3 directs agencies to review regulations and other agency actions that conflict with these policies and to develop action plans consistent with their findings. *Id.* at 8354. Section 5 takes aim at inefficiencies in federal permitting by revoking a 1977 executive order on the implementation of the National Environmental Policy Act (NEPA) and directing the Council on Environmental Quality (1) to rescind its NEPA regulations, (2) to establish new guidance for NEPA compliance, and (3) to convene a working group on agency-specific NEPA regulations. Section 5 also directs that any new regulations and permitting prioritize efficiency "[c]onsistent with applicable law." *Id.* at 8355-56. Section 7 directs agencies to pause disbursing funds appropriated through the Inflation

5

Reduction Act of 2022 (IRA) or the Infrastructure Investment and Jobs Act of 2021 (IIJA) pending review. *Id.* at 8357.

Energy Emergency declares a national energy emergency under the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, and other authorities. 90 Fed. Reg. 8433. To address "the active threat to the American people from high energy prices," the President directs agencies to use the "lawful emergency authorities" they have to facilitate energy production, including on federal lands. 90 Fed. Reg. at 8434-35. The order also directs certain agencies to prepare reports and assessments, identify planned or potential actions to abate the emergency, and convene committees. *Id.* at 8435-36.

Section 2 of Clean Coal states that "[i]t is the policy of the United States that coal is essential to our national and economic security" and that "[i]t is a national priority to support the domestic coal industry" through regulatory reform and other means. 90 Fed. Reg. at 15517. Section 3 directs the chair of an energy council to designate coal as a "mineral" under another executive order promoting mineral production. *Id.* Section 5 directs the Departments of the Interior (Interior) and Agriculture to "prioritize coal leasing and related activities, consistent

6

with applicable law." That section also instructs Interior to publish "a notice in the *Federal Register*" rescinding a coal leasing moratorium established during the Obama administration and to process certain applications from Federal coal lessees "in as expeditious a manner as permitted by applicable law." *Id.* at 15517-18. Section 7 directs several Executive Branch officials to "take all necessary and appropriate actions to promote and identify export opportunities for coal and coal technologies and facilitate international offtake agreements for United States coal." *Id.* at 15518.

None of the orders discuss wind or solar energy and thus do not "direct[] the federal government to block" them. Pls.' Br. 5. Nor do the executive orders "block renewable energy." Pls.' Br. 5. In fact, Unleashing American Energy aims to promote biofuels, geothermal heat, and hydropower, among others. 90 Fed. Reg. at 8353.

## II.   Plaintiffs' Lawsuit

Plaintiffs are a group of 22 individuals who allege injuries they attribute to climate change. 6-ER-1224-49. Three plaintiffs—Avery McRae, Miko Vergun, and Isaac Vergun—were also plaintiffs in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020).

7

Plaintiffs name as defendants United States of America, the President, the Executive Office of the President, the Office of Management and Budget, ten federal agencies, and numerous cabinet officers and other officials. 6-ER-1249-5. Plaintiffs' sprawling complaint alleges that the government-wide implementation of the executive orders will result in various agency actions that Plaintiffs assert will exacerbate climate change. *See* 6-ER-1280-1314. Plaintiffs assert that the Environmental Protection Agency (EPA), Interior, the Department of Energy, the Department of Transportation, the Army Corps of Engineers, the U.S. Department of Commerce, the National Science Foundation, and the National Institute of Health, have taken regulatory, permitting, staffing, funding, organizational, granting-making, and other actions to prioritize hydrocarbons because of the executive orders. *Id.* But Plaintiffs do not independently challenge the legality of these underlying actions here. Plaintiffs instead claim that these agency actions are unlawful *because* they are applications of the Presidential action—the executive orders—Plaintiffs say caused the agencies to act. 6-ER-1314-38; *see infra* pp.49 n.3 (listing other lawsuits challenging specific actions Plaintiffs' complaint references).

8

### III. Proceedings Below

Plaintiffs sued in May 2025 and brought six claims for relief. 6-ER-1314-38. Plaintiffs assert substantive due process violations of their rights to life (count 1) and liberty (count 2) on the theory that the challenged executive orders and, in turn, the implementing actions infringe on a fundamental right to "life-sustaining, stable climate system." 6-ER-1314; *see* 6-ER-1318.

Plaintiffs also assert three ultra vires claims, asserting that: (1) the President acted ultra vires in directing certain policy changes at EPA, and EPA acted ultra vires in implementing those changes, 6-ER-1319-30; (2) the President and unspecified agency defendants acted ultra vires in "disbanding [the U.S. Global Climate Research Program] and defunding and canceling the [National Climate Assessment]," 6-ER-1330-34; and (3) that the President and agency defendants acted ultra vires in allegedly suppressing climate science and by cutting funding and offices related to climate change. 6-ER-1331-32. Finally, Plaintiffs allege that the challenged executive orders are unconstitutional under the state-created danger doctrine. 6-ER-1335-38.

Plaintiffs allege that "[t]here is overwhelming scientific consensus that Earth is warming as a direct result of [greenhouse gas] pollution, primarily from the burning of fossil fuels" and that "[e]very ton of CO2 emitted contributes to global warming and climate change." 6-ER-1263-64. Under the executive orders, Plaintiffs say, greenhouse gas "emissions would increase by nearly 260 million metric tons of carbon dioxide equivalent ('MMT CO2e') in 2030, and more than 530 MMT CO2e in 2035." 6-ER-1264.

Plaintiffs request declaratory and injunctive relief against the challenged executive orders and their implementation. 6-ER-1338.

Plaintiffs sought preliminary injunctive relief in June 2025. 1-ER-10. Defendants opposed the motion for a preliminary injunction and moved to dismiss. *Id.* After a hearing on both motions that included witness testimony, the district court dismissed the suit. 1-ER-10-14.

The court first concluded that Plaintiffs had shown a cognizable injury in fact based on their allegations that their injuries from climate change "will imminently worsen due to the" executive orders. 1-ER-15. The district court then found this incremental injury traceable to the

10

executive orders based on Plaintiffs' estimate of additional greenhouse gas emissions attributable to the orders. 1-ER-17.

On redressability, however, the district court determined that it was bound by this Court's decision in *Juliana*. 1-ER-24-33. There, this Court rejected standing to challenge "the totality of various government actions" across decades that plaintiffs asserted facilitated hydrocarbon use that contributed to climate change. *Juliana*, 947 F.3d at 1167. Among other claims, plaintiffs asserted "a claimed right under the Due Process Clause of the Fifth Amendment to a climate system capable of sustaining human life." *Id.* at 1164. Plaintiffs sought declaratory and injunctive relief. *Id.* at 1165. Assuming the constitutional rights plaintiffs asserted exist, the Court concluded that plaintiffs' request "is beyond our constitutional power" and plaintiffs' "case for redress must be presented to the political branches of government." *Id.* at 1164-65. As this Court explained, declaratory "relief alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries," while injunctive relief against the government's affirmative acts allegedly supporting hydrocarbons "will not alone solve global climate change" and is beyond "the power of an Article III court" in any event. *Id.* at 1170-71. Among

11

other problems, the injunction plaintiffs requested in *Juliana* "would subsequently require the judiciary to pass judgment on the sufficiency of the government's response to the order, which necessarily would entail a broad range of policymaking." *Id.* at 1172.

The district court concluded that *Juilana*'s redressability analysis was on all fours here. 1-ER-23. With respect to declaratory relief, the district court determined that, as in *Juliana*, it was "not apparent that Plaintiffs' request for declaratory relief is, on its own, sufficient to establish redressability." 1-ER-26. Declaratory relief, after all, would not necessarily change the government's energy policy or "necessarily invalidate all the implementing regulations, some of which appear to rely on more than one authority." 1-ER-26.

The district court next held that Plaintiffs' requests to enjoin the executive orders and their implementation were like the request in *Juliana* for "an injunction prohibiting further Constitutional violations." 1-ER-29; *see Juliana*, 947 F.3d at 1170. The court noted that the requested injunctions "would require the Defendant agencies and—ultimately—this Court, to scrutinize every climate-related agency action taken since" the orders' issuance, requiring the court "to monitor

12

an untold number of federal agency actions." 1-ER-29. That, the court explained, is "an unworkable request for which plaintiffs provide no precedent." *Id.*

The court also observed that "the current administration may . . . rely upon other considerations" to "prioritize fossil fuels and suppress renewable energy" even if the executive orders and their implementation were enjoined. 1-ER-30. And monitoring the Executive Branch's compliance with the order "necessarily would entail a broad range of policy making." 1-ER-30 (quoting *Juliana*, 947 F.3d at 1172). Finally, by requesting an injunction of all implementation of the executive orders and all agency wide directives under the orders, the court concluded that "Plaintiffs effectively seek to enjoin not just three executive orders, but also tens—if not hundreds—of policy decisions, regulations, and projects" across the government. 1-ER-31.

The district court dismissed Plaintiffs' claims with prejudice and rejected leave to amend the complaint because "amendment in this matter would be futile" as "the relief sought in this case is beyond the bounds of" the "Article III authority." 1-ER-3.

13

## SUMMARY OF ARGUMENT

1.     The district court correctly dismissed because Plaintiffs lack Article III standing to sue.

a.     "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). For that reason, Plaintiffs' insistence that they will be injured by "[e]very additional ton of [greenhouse gas] pollution and increment of heat Defendants cause," 6-ER-1224, fails Article III's basic limits. Plaintiffs' only cognizable injury-in-fact (under this Court's caselaw) is the same as in *Juliana*: "that climate change is affecting them now in concrete ways and will continue to do so unless checked." 947 F.3d at 1168.

b.     Properly defining Plaintiffs' injury shows why it is not traceable to the executive orders. Suits about climate change inherently involve "independent third parties" that are largely "responsible for the changes contributing to plaintiffs' injuries." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013). To rise above speculation, plaintiffs must allege that the executive orders are a "substantial factor

14

in causing [their] injuries." *Juliana*, 947 F.3d at 1169 (cleaned up). But mere announcement of Executive Branch policy does not cause injury. The executive orders have not been fully implemented, and any injury Plaintiffs suffer is properly attributable to an open-ended, uncountable set of follow-on agency actions rather than the executive orders themselves. Finally, Plaintiffs fail to plausibly allege that any marginal increase in emissions they speculate are attributable to the executive orders will cause any incremental change to the climate.

c.     Plaintiffs also fail to plausibly allege redressable claims. Redressability requires that the requested relief be "both (1) substantially likely to redress [plaintiffs'] injuries; and (2) within the district court's power to award." *Juliana*, 947 F.3d at 1170 (citing *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)). Plaintiffs show neither. Standing for injunctive relief requires plausible allegations that it is "substantially likely" that enjoining the executive orders and their implementation would "redress their injuries" based on climate change. *Id.* at 1170.

Enjoining the executive orders would not do that. Plaintiffs do not plead that the agencies cannot independently undertake the same

15

climate-impacting agency actions, even if the President's executive orders are enjoined. And enjoining the executive orders is beyond Article III power because it "improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties." *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025) (cleaned up). Likewise, as in *Juliana*, declaratory "relief alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries." *Juliana*, 947 F.3d at 1170. And the declaratory relief that Plaintiffs seek here is also beyond "the district court's power to award" because no further relief is available that would allow a request for declaratory relief to constitute a case or controversy. *Id.*

　　d.　　Though Plaintiffs separately brief redressability for their ultra vires claims, the analysis is the same because the alleged injury-in-fact is the same. Plaintiffs cannot fault the district court for not separately discussing their ultra vires claims in its standing analysis when Plaintiffs' briefing below did not do so. Like their substantive due process and state-created danger claims, Plaintiffs' ultra vires claims seek a sweeping injunction against the executive

16

orders and their implementation, and courts lack the power to grant that relief.

2.     Alternatively, Plaintiffs' claims fail on the merits: the Due Process clause does not guarantee a life-sustaining, stable climate system; Plaintiffs have no actionable ultra vires claims; and the state-created danger doctrine does not apply here.

3.     Finally, the district court did not abuse its discretion in denying Plaintiffs leave to amend their complaint. Plaintiffs could plead no other facts that would state a justiciable claim. Nor have plaintiffs indicated what other facts they could plead that would state a case or controversy. Amendment would thus be futile, as the district court concluded, and leave was properly denied.

This Court should affirm.

## STANDARD OF REVIEW

This Court reviews de novo dismissals for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *N. Cnty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009). For a facial attack on the complaint's sufficiency under Article III, courts "accept all allegations of material fact as true and construe them

17

in the light most favorable to the" plaintiff. *Id.* Courts do not accept legal conclusions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The district court's decision not to allow Plaintiffs to amend their complaint is reviewed for an abuse of discretion. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

## ARGUMENT

### I. Plaintiffs lack Article III standing to challenge the President's government-wide policy directives.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "By limiting who can sue, the standing requirement implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quotation omitted).

"To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury

18

likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380.

Most plainly, as the district court concluded, "this matter is on all fours with *Juliana*," which "forecloses redressability in the present matter." 1-ER-23-24. Because failure on any standing element is dispositive, the Court can affirm dismissal on this straightforward basis. Nonetheless, Plaintiffs' allegations fail on all three elements of standing and we discuss each in turn.

A. **The Court should reject Plaintiffs' novel theory that they are injured by every additional ton of greenhouse gas emissions.**

Plaintiffs' climate-change based injuries are generalized grievances. The "very concept of global warming seems inconsistent with" the "particularization requirement," because "[g]lobal warming is a phenomenon harmful to humanity at large." *Massachusetts v. EPA*, 549 U.S. 497, 541 (2007) (Roberts, C.J., dissenting); *Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009)

19

(holding that allegations of harm from climate change are "shared by humanity at large" and thus "too generalized to establish standing").[1]

1.      The district court misread *Juliana* when it concluded that Plaintiffs pleaded cognizable injuries merely from incremental additions of greenhouse gas emissions to the atmosphere. This Court should reject Plaintiffs' novel theory that "[e]very additional ton of [greenhouse gas] pollution and increment of heat Defendants cause will cause [Plaintiffs] more harm." 6-ER-1224-49. This kind of nonspecific injury is beyond Article III's ken.

An increased risk of harm is not a cognizable injury unless the harm itself is particularized to each plaintiff. The Supreme Court has so held: "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181. Thus, in *Juliana* (and here) the cognizable injury is not climate change itself, but the particularized effects that climate change is allegedly having on plaintiffs' concrete interests. *See* 6-ER-1224-49. But because the basic question is whether plaintiffs are injured—not whether the environment itself is harmed in the abstract—plaintiffs

---

[1] Defendants recognize that this Court held otherwise in *Juliana* and raise the issue here to preserve it for further review.

can only establish standing by showing that they will personally suffer concrete harm. Likewise, to support prospective relief, those personal, concrete harms must be real and immediate rather than speculative and attenuated. *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 438 (2021).

Plaintiffs thus cannot show a cognizable injury simply by alleging that additional greenhouse gases will enter the atmosphere. That theory would allow Plaintiffs to sue about abstract and generalized effects on the atmosphere without any connection to their concrete personal interests, contravening *Laidlaw. See* 528 U.S. at 181. Assuming, as *Juliana* appears to do, that climate change generally contributes to Plaintiffs' localized harms is not the same as saying that every contribution to climate change—every additional ton of greenhouse gas emissions—affects those interests in a concrete and particularized, rather than hypothetical and conjectural, way.

To conclude otherwise would contravene basic Article III standing principles. The global nature of climate change means that "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *Am. Electric Power Co. v. Connecticut*, 564 U.S.

21

410, 422 (2011). But under Plaintiffs' theory, they could assert a cognizable injury from a ton of greenhouse gas emissions from China regardless of whether they can tie those emissions to any localized effects. That theory is inconsistent with the irreducible minimum of Article III standing, decades of case law on the issue, and *Juliana* itself. After all, in *Juliana*, this Court concluded that standing existed only because of localized, direct impacts that the plaintiffs alleged from climate change. *See, e.g.*, *Juliana*, 947 F.3d at 1168 (finding injury based on "claims that [the plaintiff] was forced to leave her home because of water scarcity").

At bottom, Plaintiffs lack a "personal stake in" stopping each individual ton of greenhouse gas emissions, *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 110 (2025), and this Court should reject Plaintiffs' contrary standing theory. *See also Lujan*, 504 U.S. at 566-67 (rejecting standing theories "whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing" and "anyone with a professional interest in such animals can sue" as "beyond all reason").

22

**2.** The district court did not recognize any other kind of injury and Plaintiffs do not affirmatively brief any other kind. *See* Pls.' Br. 10 (noting in background that Plaintiffs established injury from "dismantling of climate science" and "economic injuries"), *e.g.*, *id.* at 13-16 (briefing only redressability); 1-ER-14-19 (recognizing that the only "personal injuries that [Plaintiffs] allege are caused by climate change and will imminently worsen due to the" executive orders).

No other cognizable injury exists here. There is no separate informational injury to support Plaintiffs' ultra vires claims for the reasons discussed separately below, pp.66-67. Plaintiffs asserted economic injuries in the district court, but only "if Defendants unleash more fossil fuels pursuant to the" executive orders. SER-21. Any economic harms are thus one facet of Plaintiffs' broader claim that they suffer ongoing and worsening injuries from climate change. And nowhere do Plaintiffs assert procedural harm. *See* SER-17-21. In fact, Plaintiffs affirmatively disclaim any procedural injury. Pls.' Br. 22-24. Finally, Plaintiffs suffer no direct harm from the funding and personnel decisions they reference, since they do not allege they are grant recipients, federal employees, or the like. *See* 6-ER-1224-49. Any harm

23

on these fronts rises or falls with Plaintiffs' broader climate-related harms theory.

In sum, Plaintiffs' sole cognizable injury is the same as in *Juliana*: "that climate change is affecting them now in concrete ways and will continue to do so unless checked." 947 F.3d at 1168. It is that injury to which Plaintiffs must trace the actions they challenge and that must be redressable by court order. But they cannot establish either traceability or redressability.

## B. The climate harms Plaintiffs allege are not traceable to the executive orders they challenge.

To establish standing, Plaintiffs must plausibly allege that the climate-related harms they allege are "caused by the challenged conduct." *Juliana*, 947 F.3d at 1168. Though a "causal chain does not fail simply because it has several links," each link must "remain plausible" and must not be "hypothetical or tenuous." *Wash. Env't Council*, 732 F.3d at 1141 (cleaned up); *see Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (same). Plaintiffs' allegations fail to plausibly establish several links between the executive orders, independent actions of federal agencies, and their asserted climate injuries.

24

1.     The future harms Plaintiffs allege are not traceable to the general policy directives they challenge but to unchallenged agency actions (at least, unchallenged in this case, *see infra* pp.49 n.3 (listing other lawsuits)) Plaintiffs allege will collectively implement those broad directives over several years. *See* 6-ER-1272-1313; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412-13 (2013) (no standing when specific statutory source for alleged unlawful activity was uncertain). After all, the executive orders are, in the main, a series of general policy directives to agencies to do things like "identify and use all relevant lawful emergency and other authorities available . . . to expedite the completion of all authorized and appropriated [energy infrastructure projects]," Energy Emergency, 90 Fed. Reg. at 8434; "prioritize coal leasing and related activities, consistent with applicable law," Clean Coal, 90 Fed. Reg. at 15517; "adhere to only the relevant legislated requirements for environmental considerations," Unleashing American Energy, 90 Fed. Reg. at 8356; and "develop and begin implementing action plans to suspend, revise, or rescind all agency actions identified as unduly burdensome [on the development of domestic energy resources] . . . consistent with applicable law," *id.* at 8354.

25

Challenging these policy directives in a vacuum—before they are final, concrete agency actions—makes it impossible to know whether or how they will affect Plaintiffs' personal interests. *See Missouri v. Biden*. 52 F.4th 362, 370 (8th Cir. 2022) (holding that hypothetical harm from an executive order had to be traced to regulatory actions implementing that order); *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023) ("Such harms are traceable to possible agency actions, not to E.O. 13990 or the Interim Estimates."). Though Plaintiffs reference some implementing actions, they have staked their claim to standing on the asserted effects of the executive orders as a whole, and—presumably to avoid the requirements of the Administrative Procedure Act—they have disavowed challenges to specific agency implementing actions. Plaintiffs therefore cannot rely on those limited actions to demonstrate traceability. *See infra* pp.50-51.

**2.** Plaintiffs' lawsuit also fails Article III's traceability requirement because it rests on speculation about the actions of third parties. Suits about climate change inherently involve "independent third parties" across the globe that are largely "responsible for the changes contributing to Plaintiffs' injuries." *Wash. Env't Council*, 732

26

F.3d at 1144; *accord Ctr. for Biological Diversity*, 563 F.3d at 479 (causation lacking because the petitioners rely on speculation that "different groups of actors" like "oil companies" and "individuals using oil in their cars" "might act in a certain way in the future"). Plaintiffs' theory of traceability depends on whether private companies will, in fact, react to future federal agency regulatory changes to then produce, transport, and burn more oil and coal, in response to Executive Branch policies (and not produce, for example, more geothermal or nuclear energy that agencies have been directed to promote). *See, e.g.*, 6-ER-1268, 1273-74, 1285, 1294.

Even if this speculation were taken as true, Plaintiffs own estimate is that the executive orders could cause greenhouse gas emissions to "increase by nearly 260 million metric tons of carbon dioxide equivalent ('MMT CO2e) in 2030, and more than 530 MMT CO2e in 2035." 6-ER-1264. In 2019, annual greenhouse gas emissions were nearly 60 gigatons of carbon dioxide equivalent, or nearly 60 *billion* metric tons.[2] Plaintiffs thus estimate that less than 1% of global

---

[2] *See* https://www.epa.gov/ghgemissions/global-greenhouse-gas-overview (last visited Feb. 24, 2026) (chart documenting 2019 global greenhouse gas emissions by type and sector), also available in permalink: https://perma.cc/7AUY-JMBL (captured Feb. 24, 2026). Plaintiffs did

emissions are attributable to the executive orders. That is not a
"substantial factor in causing the plaintiffs' injuries." *Juliana*, 947 F.3d
at 1169 (cleaned up); *see also Mendia v. Garcia*, 768 F.3d 1009, 1013
(9th Cir. 2014). Instead, "[b]ecause a multitude of independent third
parties are responsible for the changes contributing to [p]laintiffs'
injuries, the causal chain is too tenuous to support standing." *Wash.
Env't Council*, 732 F.3d at 1144.

    *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) is not to the
contrary. The Supreme Court in *Massachusetts* concluded that the
Commonwealth of Massachusetts had standing to challenge EPA
rulemaking over greenhouse gas emissions based on the automotive
industry's 6-percent contribution to worldwide emissions. *Id.*; *see also
id.* at 544 (Roberts, J., dissenting); *Wash. Env't Council*, 732 F.3d at
1144 (distinguishing *Massachusetts*). That decision granted the
Commonwealth "special solicitude in [the Court's] standing analysis,"
because of "its quasi-sovereign interests" in protecting its land,
*Massachusetts*, 549 U.S. at 520. And the Court applied a relaxed

---

not dispute this statistic and percentage below, SER-23-25, 89, and it is
subject to judicial notice. *See United States v. Orozco-Acosta*, 607 F.3d
1156, 1164 n.5 (9th Cir. 2010) (taking judicial notice of government
statistics).

standard for redressability and immediacy used in procedural rights cases. *Wash. Env't Council*, 732 F.3d at 1144 (distinguishing *Massachusetts* on these based on these two factors). Those dynamics are absent from the private interests here and Plaintiffs must be held to ordinary traceability standards.

*Juliana* does not alter the analysis either. There, the plaintiffs challenged 50 years of "federal subsidies and leases" for hydrocarbons, which they alleged accounted for 25% of historical emissions attributable to the United States. 947 F.3d at 1169. That is far higher than the less-than-one-percent contribution Plaintiffs allege here.

In the end, Plaintiffs' climate-based injuries are not traceable to the executive orders because those orders are not a substantial factor in causing climate change.

### C.   A favorable ruling cannot redress Plaintiffs' alleged injuries.

Redressability requires that the requested relief is "both (1) substantially likely to redress [plaintiffs'] injuries; and (2) within the district court's power to award." *Juliana*, 947 F.3d at 1170 (citing *M.S.*, 902 F.3d at 1083). Plaintiffs' requests for injunctive and declaratory relief are neither.

29

### 1. An injunction against the executive orders and their implementation will not provide redress and is beyond the judicial power.

Here, "[t]he crux of [P]laintiffs' requested remedy is an injunction" that seeks to "enjoin the Executive from exercising discretionary authority expressly granted by Congress." *Juliana*, 947 F.3d at 1170. After all, the executive orders simply direct agencies to exercise discretion granted by Congress in ways consistent with Presidential policy preferences, and only if doing so is "consistent with applicable law." 90 Fed. Reg. at 8359; 90 Fed. Reg. at 15519; 90 Fed. Reg. at 8437. Enjoining the President from issuing these policy directives and enjoining the Executive branch from exercising discretion vested by Congress is both unlikely to remedy Plaintiffs' alleged injuries and far beyond the judiciary's power.

1. To establish redressability, Plaintiffs must allege facts plausibly showing that it is "substantially likely" that enjoining the executive orders and their implementation would "redress their injuries." *Juliana*, 947 F.3d at 1171. But, as in *Juliana*, enjoining the challenged executive orders will not "suffice to stop catastrophic climate change or even ameliorate [Plaintiffs'] injuries." *Id.* at 1170.

30

If this Court was "skeptical that th[is] redressability prong [was] satisfied" in *Juliana*, it should be more skeptical here. 947 F.3d at 1171. The sum of emissions from just the "affirmative activities by the government" to promote hydrocarbons at issue in *Juliana* was orders of magnitude greater than the emissions Plaintiffs allege are attributable to the executive orders they challenge here. The programs challenged in *Juliana* amounted to "[a]bout 25% of fossil fuels extracted in the United States" because those hydrocarbons "come from federal waters and lands" and thus require federal authorization. *Id.* at 1169. And the total emissions of the United States in turn "accounted for over 25% of worldwide emissions from 1850 to 2012, and currently account[] for about 15%." *Id.* Plaintiffs here, by contrast, take aim at a fraction of that sum over a much shorter timeframe: by their estimate, the executive orders will contribute less than 1% to annual global emissions by 2035. *See supra* pp.27-28. Assuming Plaintiffs' requested injunction would curb those emissions (an unwarranted assumption, as discussed, pp.32-33), doing so would not begin to address Plaintiffs' climate-based injuries.

Plaintiffs assert (Pls.' Br. 34-35) that "every ton not emitted lessens global warming," but that contention is based on the incorrect premise that each additional ton of greenhouse gas emissions and any resulting "increment of heat" is a separate cognizable injury, *see supra* pp.20-22. Because, as in *Juliana*, Plaintiffs' only cognizable injuries are the particularized impacts of climate change on Plaintiffs themselves, they cannot rely on the possibility of small-scale reductions in greenhouse gas emissions to show redressability. Indeed, this Court rejected a similar argument in *Juliana* when it explained that *Massachusetts* did not "hold that a perceptible reduction in the advance of climate change is sufficient to redress a plaintiff's climate change-induced harms." *Juliana*, 947 F.3d at 1171 n.7 (cleaned up). As in *Juliana*, Plaintiffs here fail to plausibly allege that enjoining the executive orders' implementation will "stop catastrophic climate change or even ameliorate their injuries." *Id.* at 1170.

Plaintiffs also face a separate redressability problem that mirrors their traceability problems. Plaintiffs cannot show that it is likely that, without the executive orders, the Executive Branch would take a different approach. *See Murthy*, 603 U.S. at 74 (no redressability where

32

"[e]njoining the Government defendants . . . is unlikely to affect [third party] content-moderation decisions"). After all, the agencies can continue to permissibly exercise their discretion to promote the President's policies as expressed in the executive orders by streamlining permitting decisions, reviewing funding decisions, convening committees, and the like. Though Plaintiffs contend (Pls.' Br. 35, 56-57) that enjoining implementation of the executive orders would prevent agencies from relying on them in future decision making, that is not the right question. Instead, the question here, as in *Juliana*, is whether an injunction is "substantially likely" to ameliorate Plaintiffs' climate injuries. 947 F.3d at 1170. It would not.

Plaintiffs' reliance (Pls.' Br. 22-23) on *Massachusetts v. EPA* is misplaced. As discussed above, that case deals with procedural claims not at stake here asserted by a state in its quasi-sovereign capacity. 549 U.S. at 520. So it has nothing to say about what constitutes a "substantial likelihood" of ameliorating a climate injury asserted by private plaintiffs making unrecognized substantive due process claims. *See Ctr. for Biological Diversity*, 563 F.3d at 478 (distinguishing

between procedural and substantive injury in the climate change context).

Plaintiffs are thus incorrect (Pls.' Br. 35-36) that the district court erred in finding no redressability after it found traceability. In fact, both are absent here. But even assuming Plaintiffs plausibly alleged traceability, there is nothing remarkable about the district court's conclusion that redressability is lacking. This Court reached the same conclusion in *Juliana* when it determined that, although genuine disputes of material fact precluded summary judgment on traceability in that case, the plaintiffs there could not establish redressability. 947 F.3d at 1169-73. In any event, Plaintiffs' arguments here ignore the separation of powers problems (discussed next) that an injunction of the kind Plaintiffs seek would have.

**2.** Courts lack the power to enjoin the government from implementing the executive orders. Here, as in *Juliana*, Plaintiffs bring substantive constitutional claims and seek "to enjoin the Executive from exercising discretionary authority expressly granted by Congress." 947 F.3d at 1170. That is far beyond the judicial power.

34

The "judicial Power of the United States," U.S. CONST. art. III, § 1, is "to render dispositive judgments" in Article III "cases and controversies." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (citation omitted). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the courts] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* (cleaned up).

Assume for the moment that Plaintiffs are correct on the merits: the executive orders and their implementation are unconstitutional for substantive due process or separation of powers reasons. *Any* injunctive relief against the executive orders or their implementation for this violation "improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties." *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025) (cleaned up). The nature of the executive orders themselves makes this

35

so: they are general policy directives that set the Executive Branch's priorities and are explicit that they can be implemented only in accordance with applicable law.

Article III power extends only to "matters that were the traditional concern of the courts at Westminster," *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000) (quoting *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (opinion of Frankfurter, J.)), or "within the traditional scope of equity as historically evolved in the English Court of Chancery." *Guaranty Tr. Co. v. York*, 326 U.S. 99, 105 (1945); *see also CASA*, 606 U.S. at 841 (equitable power includes "remedies traditionally accorded by courts of equity at our country's inception" (cleaned up)).

This suit asks the courts to review the President's energy policy and the Executive Branch's decisions made under that overarching policy, and to pass on the comprehensive constitutionality of all these policies, programs, and decisions outside the separate and distinct statutory frameworks, substantive standards, procedural requirements, and judicial-review provisions applicable to each separate agency action. *See, e.g.*, 5 U.S.C. §§ 702, 704, 706 (Administrative Procedure

36

Act); 42 U.S.C. § 7607(b)(1) (petitions for review for certain EPA actions under the Clean Air Act). No federal court has ever purported to use the "judicial Power" to perform such an expansive policy review. And for good reason: Article II commits to the President—not the courts—the power to oversee the Executive Branch's exercise of discretion and policy choices inherent in administering the law. *Myers v. United States*, 272 U.S. 52, 135 (1926); *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002).

The text of the challenged executive orders bears out that any injunction would be an improper infringement on the Executive Branch's prerogatives in exercising the discretion delegated to it by Congress. For example, the courts would have to determine the wisdom of the President's determinations that it is "in the national interest to unleash America's affordable and reliable energy and natural resources," Unleashing American Energy, 90 Fed. Reg. at 8353; that energy and critical minerals infrastructure "are all far too inadequate to meet our Nation's needs," Energy Emergency, 90 Fed. Reg. at 8433; and "that coal is essential to our national and economic security," Clean Coal, 90 Fed. Reg. at 15517. And all of this without regard for whether

37

the many agencies' implementation of the orders "can be carried out consistent with the constraints of law." *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Sotomayor, J., concurring in grant of stay). Indeed, the executive orders themselves *mandate* that agencies implement them "consistent with applicable law." Plaintiffs' requested injunction would thus "have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action." *Laird v. Tatum*, 408 U.S. 1, 14-15 (1972).

Indeed, the President could have accomplished the same goals set out in the executive orders by conveying his policy preferences for unleashing American energy, for example, at a meeting of his Cabinet. Could a court then enjoin the President from issuing these instructions or enjoin the Cabinet officers present at that meeting from carrying out the President's policy direction? Of course not. But Plaintiffs' conception of Article III seems to encompass that kind of judicial incursion. After all, enjoining the general policy directives contained in the executive orders at issue here would amount to the same thing. That cannot be the law.

38

"There simply are certain things that courts, in order to remain courts, cannot and should not do." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring). One of those things is "running Executive Branch agencies." *Id.* at 133. An injunction against the ten named executive agencies, plus the Executive Office of the President and the Office of Management and Budget, essentially asks the courts to take over the Executive Branch's energy policy. As the district court pointed out, "[g]ranting Plaintiffs' injunction would require the Defendant agencies and—ultimately—this Court, to scrutinize every climate-related agency action taken since January 20, 2025, to determine whether it was implemented pursuant to the [executive orders] or to some other Government policy." 1-ER-29. Indeed, an injunction like this would require the court "to monitor an untold number of federal agency actions to determine whether they contravene the injunction." 1-ER-29. Because an injunction is "only as good as the court's power to enforce it," the unworkable consequences of injunctive relief here reinforce that it is beyond Article III power. *Juliana*, 947 F.3d at 1173.

To conclude otherwise would violate separate of powers principles. The "Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Defs. of Wildlife*, 504 U.S. at 559-60. As this Court recognized in *Juliana*, Plaintiffs may challenge discrete government actions (or inaction), but their demand for changes to the government's overall regulation of hydrocarbons (and associated emissions) "must be made to the political branches or to the electorate at large" rather than in a single district court, 947 F.3d at 1175; *accord Allen v. Wright*, 468 U.S. 737, 759-60 (1984) (observing that "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations" "are rarely if ever appropriate for federal-court adjudication"). That is because policy decisions that "require consideration of competing social, political, and economic forces . . . must be made by the People's elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Juliana*, 947 F.3d at 1172 (cleaned up). *Juliana*'s

40

admonition against judicial usurpation of political and policy processes applies equally here.

Plaintiffs are incorrect (Pls.' Br. 31-32) that enjoining the implementation of executive orders of the kind at issue here is within courts' traditional equitable powers. By prohibiting the defendant agencies from carrying out the executive orders "to the extent permitted by law," Plaintiffs' requested injunction would in effect prohibit the Executive Branch from pursuing the President's policy priorities through the lawful means available. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), which Plaintiffs rely on (Pls.' Br. 32), stands only for the uncontroversial proposition that injunctions against specific unconstitutional acts are available as "a judge-made remedy." It does not speak to whether injunctions can block entire fields of Executive Branch policy. They cannot.

Plaintiffs' other authority is further from the mark. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952), was about the President and Commerce Secretary's orders seizing steel mills, and the question was whether the Executive Branch had the authority to do this absent statutory authorization. Here, by contrast, the executive order

41

explicitly limits its application to actions allowed by law. *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 412-33 (1935), approved injunctions against specific executive actions issued under an unconstitutional Congressional delegation of legislative power. Plaintiffs' remaining authorities (Pls.' Br. 32) are about injunctions against state officials and again concern specific violations of law, rather than general policy direction. *See Sterling v. Constantin*, 287 U.S. 378, 387 (1932); *Osborn v. Bank of U.S.*, 22 U.S. 738, 871 (1824). None condone use of the judicial power to prohibit the Executive Branch from pursuing the President's policy priorities in a manner "consistent with applicable law."

That courts "enforce fundamental constitutional rights" even in the face of "policy implications" (Pls.' Br. 37) is beside the point. Here, Plaintiffs do not ask that a specific law or executive action be deemed unconstitutional. Rather, as in *Juliana*, Plaintiffs seek "to enjoin the Executive from exercising discretionary authority expressly granted by Congress," by challenging Executive-Branch-wide energy policy. 947 F.3d at 1170; *see id.* at 1170-71 (rejecting same argument plaintiffs raise here). Nor does it matter that Plaintiffs allege that the executive

orders encroach on fundamental rights. Pls.' Br. 39. Though the standing analysis assumes a plaintiff will prevail on its claims, this Court found no standing in *Juliana* to assert nearly identical fundamental rights claims. 947 F.3d at 1170. Assuming Plaintiffs are correct on the merits does not change the fact that the questions here, like those in *Juliana*, "are the province of the political branches." *Id.* at 1173.

Plaintiffs are wrong (Pls.' Br. 39) that "the injunctions requested here do not come close to the outer limits of the district courts' power." *M.S.*, 902 F.3d at 1087-88, which Plaintiffs cite, merely stated the principle that extremely narrow circumstances could warrant a "remedy requiring the enactment of legislation," and the Court's holding there was simply that "structural constitutional limits prevent federal courts from ordering officials to enact or implement a bill that has not completed a lawfully prescribed legislative process." *Id.* at 1087. Requiring the enactment of specific legislation to address the narrow situations discussed in *dicta* in *M.S.* is arguably less intrusive than the wholesale usurpation of Executive authority, discretion, and policy prerogatives that Plaintiffs envision. Anyway, *Juliana* rejected

43

standing to "enjoin the Executive from exercising discretionary authority expressly granted by Congress," 947 F.3d at 1170, and nothing in *M.S.* countermands that result here.

The immigration-related decisions Plaintiffs cite are also distinguishable because they concern far more discrete actions with direct, tangible effects. *See Washington v. Trump*, 145 F.4th 1013, 1023 (9th Cir. 2025) (executive order with "automatic and direct effect of denying citizenship," rendering those affected "ineligible for federal programs and for Social Security Numbers"); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025) (concluding that implementation of Remain in Mexico policy constituted final agency action under the APA). These authorities thus do not condone the capacious injunction Plaintiffs seek here.

3.    Plaintiffs' separate arguments (Pls.' Br. 48-57) that relief against the executive orders' implementation is workable and within the court's power fail for many of the reasons already discussed. They also fail on their own terms.

Plaintiffs first accuse the district court of failing to consider "the actual scope of the requested injunction" and assert that the court

44

should have reached the merits before deciding injunctive relief was unavailable. Pls.' Br. 48. But that gets the inquiry backwards, because courts must decide the question of jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). Anyway, Plaintiffs do not say how the district court misconstrued their request. The court was right to be concerned about how many agency actions might be dragged into the case, because an injunction is "only as good as the court's power to enforce it." *Juliana*, 947 F.3d at 1173. As discussed, Plaintiffs' complaint includes all manner of alleged agency misconduct that would be swept into court supervision. Courts lack generalized supervisory power over, for example, the membership of advisory committees, the contents of agencies' websites, or agency staffing levels under the guise of an injunction to protect substantive due process rights. *See, e.g.*, 6-ER-1283, 1307, 1333.

Plaintiffs further argue that the "general language" they suggest for an injunction is appropriate (Pls.' Br. 52); that the district court did not have to evaluate the actual language of the injunction they requested and should have considered partial relief too (Pls.' Br. 54); and that the district court erred by analyzing an injunction Plaintiffs

45

did not request (Pls.' Br. 55). *See also* Pls.' Br. 57 (asserting both that "the district court did not confine its analysis to the Complaint's requested relief and did not consider any forms of partial relief"). In fact, the district court—like this Court in *Juliana*—rightly considered the consequences of the injunctive relief Plaintiffs requested before concluding it lacked Article III jurisdiction. 1-ER-29-33.

Plaintiffs requested a permanent injunction against all Defendants, "their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Executive Orders" and a permanent injunction against this same broad group to "rescind all agency-wide directives applying, implementing, and effecting" the orders. 6-ER-1338. That is what the court considered. 1-ER-29-33. And it does not matter (Pls.' Br. 52) that district courts have used general language like this in other cases; the question is whether the injunctive relief Plaintiffs seek here is within the Article III power.

Any partial relief—like a "prospective injunction" or an injunction against only specific provisions of the executive orders or specific agency actions (*see* Pls.' Br. 55)—suffers the same flaws as the full relief

46

Plaintiffs requested. Those injunctions too would require the district court to engage in nonjudicial policy making and monitor the Executive Branch's prospective compliance, because any injunction here would flow from a conclusion that the President's policy directives violate a substantive constitutional right. *See* 1-ER-29-30; *see Defs. of Wildlife*, 504 U.S. at 559-60; *Juliana*, 947 F.3d at 1175.

Plus, more than the expansive relief Plaintiffs do request, any partial relief would fall far short of ameliorating Plaintiffs' alleged injuries from climate change because those partial remedies would do even less to stop it. *See Juliana*, 947 F.3d at 1170 (even order enjoining all affirmative activities relating to hydrocarbons would not "suffice to stop catastrophic climate change or even ameliorate their injuries"). Plaintiffs' contrary authority (Pls.' Br. 53, 54) stands only for the proposition that redressability depends "on the relief that federal courts are *capable* of granting." *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017); *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 958 (9th Cir. 2025) (noting same principle in antitrust suit where real dispute was "[t]he ultimate scope

47

of an injunction"). Here, for the reasons already discussed, the courts are capable of none.

Plaintiffs also fault the district court (Pls.' Br. 55) for considering other consequences of their requested injunction. The district court explained that an injunction would "return to the regulatory status quo as it existed on January 19, 2025," and then the court would inevitably have to parse the Executive Branch's policy choices to determine whether the administration is relying on the executive orders or "other considerations to, in Plaintiffs' view, prioritize fossil fuels and suppress renewable energy." 1-ER-30. As discussed, the district court was right to worry that the injunction Plaintiffs requested would turn back the clock on this Administration's policy choices and would ensnare the judiciary in passing on the wisdom of those policy choices going forward. *See Juliana*, 947 F.3d at 1172 (injunction beyond the judicial power when its enforcement "necessarily would entail a broad range of policymaking").

*Gutierrez* does not hold otherwise. *Contra* Pls.' Br. 22-23. There, the Supreme Court held that a death-row petitioner had standing to bring a procedural due process challenge to a state law that prevented

48

him from obtaining allegedly exculpatory DNA testing because procedural injury claimants need not prove that their requested procedural relief would likely alter the substantive outcome. 145 S. Ct. at 2267-69 (holding that jurisdiction over "a procedural due process claim like the one Gutierrez presses" cannot be defeated by argument that "the same substantive outcome will result" (citing *Lujan*, 504 U.S. at 572 n.7)). Plaintiffs here, by contrast, assert "a substantive right, not a procedural one," for which a relaxed showing is unavailable. *Juliana*, 947 F.3d at 1171 n.7.

That "courts across the country . . . have engaged in the task of reviewing dozens to hundreds of agency actions taken since January 20, 2025," Pls.' Br. 49; *see also* Pls.' Br. 49-50, 52, 53-54, supports our point. Those separate suits do not take the same blunderbuss approach to challenging Executive Branch action that Plaintiffs have taken here—in general, they challenge far more discrete actions. *See* Pls.' Br. 49-50, 50 n.6, 52, 53-54.[3] Enjoining implementation of the executive orders would

---

[3] *See, e.g.*, *Venner v. EPA*, No. 26-1038 (D.C. Cir. filed Feb. 18, 2026) (petition by minor children for review of rule rescinding endangerment finding asserting violations of the Clean Air Act, the Religious Freedom Restoration Act, and the First, Fifth, and Tenth Amendments); *Appalachian Voices v. EPA*, 2025 WL 2494905, at *2-*9 (D.D.C. Aug. 29, 2025), *appeal filed* No. 25-5333 (D.C. Cir.) (summarizing cases

sweep the subject matter of all these separate suits—plus any nascent rulemakings or other changes to regulatory frameworks that have not yet happened—under the supervision and purview of one district judge in one omnibus lawsuit. *See* 1-ER-29. That is beyond the Article III power and unprecedented.

Separately, the fact that Plaintiffs here, unlike in *Juliana*, do not challenge the course of government conduct over 50 years, distinguishes the Court's holding in *Juliana* that the strictures of the Administrative Procedure Act (APA) did not apply. 947 F.3d at 1167. Plaintiffs' allegations of injury from every additional ton of greenhouse gas emissions are not cognizable, but if they were, the APA and other

---

challenging EPA's rescission of IRA funds and dismissing suit); *Revolution Wind, LLC v. Burgum*, 2026 WL 113568, at *1 (D.D.C. Jan. 12, 2026) (one of eight suits challenging stop work order on offshore wind energy projects); *New York v. Trump*, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) (challenging withdrawal of unleased areas of outer Continental shelf from offshore wind projects); *Air Alliance Houston, et al. v. Trump, et al.*, 1:25-cv-1852 (D.D.C. filed June 12, 2025) (challenging proposal to repeal most of a rule on emissions standards for coal- and oil-fired electric utility steam generating units that cites the executive orders); *Ctr. for Biological Diversity v. Dep't of the Interior*, 3:25-cv-10793 (N.D. Cal. filed Dec. 18, 2025) (challenging Interior's proposed NEPA regulations that cite Unleashing American Energy); *Sierra Club v. Dep't of Energy*, Nos. 25-1159, 1160, 1162 (D.C. Cir.) (challenging emergency orders directing J.H. Campbell Power Plant to remain available for operation).

judicial review provisions are the appropriate avenues to challenge any final agency action that will allegedly lead to additional tons of greenhouse gas emissions. Congress's enactment of the APA and similar judicial review provisions channel challenges to agency actions into carefully organized frameworks. *See, e.g., Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62, 64 (2004) (*SUWA*); *accord Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990). Plaintiffs cannot avoid those frameworks and their limitations through omnibus pleading.

**4.** Finally, the district court rightly concluded that *Juliana* governs here, and Plaintiffs' attempts (Pls.' Br. 14-20) to distinguish that decision and its precursors fail. Plaintiffs are correct (Pls.' Br. 15-16) that this case, unlike *Juliana*, does not seek a remedial plan with decades of judicial oversight. But it does, as in *Juliana*, seek "to enjoin the Executive from exercising discretionary authority expressly granted by Congress," by challenging Executive-Branch-wide energy policy. 947 F.3d at 1170. This Court has already found that Article III power does not extend to that request. And, for the reasons already discussed, this case seeks far more than "traditional" injunctive relief. Pls.' Br. 15.

51

Plaintiffs go to great lengths (Pls.' Br. 16-20) to trace the history of the case law on which *Juliana* relied for its two-part redressability test to assert that these cases present "unique factual circumstances" not present here, Pls.' Br. 19. But the relief requested here is equally exceptional. And neither *Juliana* nor the precedent it relied on limited the two-part redressability test to the facts presented there. *Juliana*, 947 F.3d at 1170; *M.S.*, 902 F.3d at 1083. Plaintiffs cannot avoid *Juliana*'s application.

### 2. Declaratory relief cannot redress Plaintiffs' injuries and is beyond the Court's power.

Declaratory relief alone will not redress Plaintiffs' climate-based injuries and, because no further relief (Plaintiffs' requested injunction) is available, declaratory relief is also beyond the court's power.

**1.** As in *Juliana*, declaratory "relief alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries." *Juliana*, 947 F.3d at 1170. Though it is "undoubtedly likely to benefit the plaintiffs psychologically," that relief "is unlikely by itself to remediate their alleged injuries absent further court action." *Id.* Apart from psychological satisfaction, Plaintiffs fail to explain how a declaratory judgment, without more, would redress their alleged injuries.

52

Even if the district court could award a judgment declaring the executive orders unconstitutional (which it cannot, *infra* pp.56-62), such a declaration would not prevent Defendant agencies from using their lawful authorities to take any of the actions Plaintiffs say contribute to their injuries, and Plaintiffs do not allege otherwise, *see* Pls.' Br. 56. To declare that the executive orders are unconstitutional is not to declare that any action taken in furtherance of the policies underlying the orders would also be unconstitutional. Plaintiffs are thus wrong that a declaratory judgment "would clearly communicate to Defendants the unconstitutionality of the [executive orders] and what implementing conduct cannot lawfully be pursued going forward." Pls.' Br. 29. That kind abstract declaration of rights would not redress Plaintiffs' alleged injuries.

Nor can an improper declaratory judgment be saved by a prediction that government defendants "would predictably conform their conduct to respect Plaintiffs' rights consistent with the court's declaration of law." Pls.' Br. 26. "'[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of [its] opinion.' . . .

53

Otherwise, redressability would be satisfied whenever a decision might persuade actors who are not before a court—contrary to Article III's strict prohibition on 'issuing advisory opinions.'" *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

An unenforceable declaratory judgment would also not "overturn" the executive orders or stop policies consistent with them. *Contra* Pls. Br. 26. Executive orders are not laws in the ordinary sense. Rather, executive orders generally "properly supervise and guide" Executive Branch discretion but ordinarily do not confer rights and are not judicially enforceable. *Myers*, 272 U.S. at 135; *see also Bldg. & Const. Trades Dep't*, 295 F.3d at 32 ("[The President's] faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates.").

The executive orders here fit this mold because they do not purport to establish new authority for agencies to take the regulatory and rulemaking action they direct. Instead, they direct agencies to take those actions based on the "authorities available to them," Energy Emergency, 90 Fed. Reg. at 8434, or "all possible authorities,"

54

Unleashing American Energy, 90 Fed. Reg. at 8355-56. And each repeatedly cautions agencies to take action only "as permitted by applicable law." Clean Coal, 90 Fed. Reg. at 15518; *see also id.* 15517, 15517; Energy Emergency, 90 Fed. Reg. at 8434, 35; Unleashing American Energy, 90 Fed. Reg. at 8353, 54, 56, 57-58.

Plaintiffs' authorities (Pls.' Br. 26-27) reflect only that a law declared unconstitutional will not be applied against a party in a future case. *See Steffel v. Thompson*, 415 U.S. 452, 470 (1974) ("If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to reverse any conviction under the statute."); *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 122 (2025) (pointing to separate enforcement actions as undermining redressability argument that declaring regulation unlawful would have no effect). But there is no statute or regulation to declare unconstitutional or unlawful here. The President's policy goals and priorities will remain the same whether expressed in executive order or otherwise.

Likewise, it does not matter whether declaratory relief might "prevent future litigation against the" executive orders. Pls.' Br. 28.

55

That argument seems to allude to others' choices about whether to sue, not an argument that Plaintiffs themselves would benefit from an unenforceable declaration. But without showing how such a declaration would redress their personal injuries, Plaintiffs fail to establish redressability. That such a declaration may, as a practical matter, lead others to decline a suit seeking coercive relief is beside the point.

In short, *Juliana* is indistinguishable on this point and the district court correctly held Plaintiffs failed to plausibly allege redressable claims.

**2.** Declaratory relief is also beyond "the district court's power to award." *Juliana*, 947 F.3d at 1170. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, redressability normally rests on the potential for "further court action." *Juliana*, 947 F.3d at 1170. But no further action is possible here, so the court has no power to award declaratory relief either.

A declaratory judgment that merely states the rights of the parties without altering their legal relationship is an impermissible advisory opinion. "What saves proper declaratory judgments from a redressability problem . . . is that they have preclusive effect on a

56

traditional lawsuit that is imminent." *Brackeen*, 599 U.S. at 293 (internal quotation omitted); *see, e.g.*, *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012 (9th Cir. 2023) (use of declaratory judgment in subsequent trademark dispute). If the courts could pass on the legality of government actions in the abstract, it "would threaten to grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California v. Texas*, 593 U.S. 659, 673 (2021).

A bare declaration of unconstitutionality "is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *California*, 593 U.S. at 673; *see also Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) (courts look to "the nature of the threatened action in the absence of the declaratory judgment suit" to determine whether jurisdiction exists). To conclude otherwise "would allow a federal court to issue what would amount to 'an advisory opinion without the possibility of any judicial relief.'" *California*, 593 U.S. at 673 (cleaned up). "Article III guards against federal courts assuming this kind of jurisdiction." *Id.* The declaration Plaintiffs seek here would have no preclusive effect on an imminent suit or itself compel the

57

government to take any action, nor could a declaration here serve as the basis for a future lawsuit seeking relief from any conduct declared unlawful. That is because, as discussed, injunctive relief is unavailable here.

Contrary to Plaintiffs' argument (Pls.' Br. 21), declaratory relief can only redress an ongoing injury where additional relief is available either in that lawsuit or a future one. *California v. Texas*, 593 U.S. 659, 673 (2021). The authorities Plaintiffs rely (Pls.' Br. 21) on do not say otherwise. The law at issue in *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74-75 (1978), capped operators' liability for nuclear accidents and the plaintiffs proved that a proposed nuclear power plant nearby was unlikely to proceed "but for the protection provided by" the law. *Duke Power*, 438 U.S. at 74-75 (cleaned up). Unlike the executive orders here, that liability cap was a self-executing, judicially enforceable limit on a defendants' liability in tort; declaring it unlawful would mean courts could not rely on it to limit liability in a future tort lawsuit.

In *Franklin*, a four-Justice plurality concluded only that it could avoid the question of whether courts were empowered to enjoin the

58

President because "the injury alleged [in the case] is likely to be redressed by declaratory relief against the Secretary alone," and injunctive relief was available against that official, if not the President. 505 U.S. at 802-03. But the plurality's statement assuming that officials "would abide by an authoritative interpretation," *id.*, has never been adopted by a majority. In fact, the recent majority opinion in *Brackeen* relied on Justice Scalia's concurring opinion instead, foreclosing any reliance on the *Franklin* plurality's language on this point. *Brackeen*, 599 U.S. at 294. *Utah v. Evans*, does not hold otherwise, because the Court there acknowledged that injunctive relief was also available in that case. 536 U.S. 452, 464 (2002). Indeed, this Court could not have concluded in *Juliana* that declaratory relief would only "benefit the plaintiffs psychologically," 947 F.3d at 1170, if these cases mean what Plaintiffs say they do.

The Ninth Circuit decisions Plaintiffs rely on for this point (Pls.' Br. 21) are also readily distinguishable. The State of California threatened to prosecute a fois gras seller who then sought declaratory relief "clarifying the scope of [a] California law" banning certain fois gras sales. *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,

59

33 F.4th 1107, 1120 (9th Cir. 2022). Declaratory relief was available to clarify the scope of the law because it could prevent the threatened prosecution. *See id.* And in *Pharmaceutical Research & Manufacturers of America. v. Stolfi*, 153 F.4th 795, 831 (9th Cir. 2025), it was only "the preclusive effect of" a declaratory judgment "binding the State in any subsequent lawsuits seeking compensation for unconstitutional takings under the challenged provisions" that made the plaintiffs' injuries redressable through declaratory relief. Here, by contrast, Plaintiffs seek a declaration that the government is violating their rights in the abstract, unmoored from any particular action or dispute.

Plaintiffs' reliance (Pls.' Br. 21-22) on cases that did not concern declaratory judgments is also misplaced. *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021), is about nominal damages and has nothing to say about this Court's analysis of judicial power in *Juliana*, declaratory relief, equitable relief more broadly, or anything else of relevance here. Rather, the Supreme Court in *Uzuegbunam* addressed whether nominal damages would provide First Amendment plaintiffs redress for *past* injuries. 592 U.S. at 288-89. In its discussion of nominal damages, the Supreme Court referenced their "declaratory function." *Id.* at 286. But

60

*Uzuegbunam* remained a damages case, and the Supreme Court did not purport to work a change in the law, abrogate *Juliana*, or undermine the principle that a declaration of unconstitutionality "is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *California*, 593 U.S. at 673.

*Diamond Alternative Energy v. EPA*, 606 U.S. 100, 114 (2025), is distinguishable for similar reasons. *See* 1-ER-27-28 (discussing the case); Pls.' Br. 10-11, 27 (same). That case involved fuel producers' suit to vacate EPA's preemption waiver for California regulations requiring automakers to "manufacture more electric vehicles and fewer gasoline-powered vehicles." *Id.* at 116-17. The fuel producers demonstrated their claims were redressable because invalidating the state regulation would lead to "more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers." *Id.* The case said nothing about whether the relief requested was itself beyond Article III power; the question there concerned workaday questions of the evidentiary showing needed for redressability.

61

Finally, Plaintiffs are incorrect (Pls.' Br. 23-24) that the district court "hardened the redressability standard for substantive due process" by distinguishing *Gutierrez v. Saenz* and *Massachusetts*. The district court merely noted the principle, expressed in *Massachusetts* itself, that a plaintiff "accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts*, 549 U.S. at 517 (quoting *Lujan*, 504 U.S. at 572 n.7); *see also Gutierrez*,606 U.S. at 320 ("That a prosecutor might eventually find another reason, grounded in Article 64 or elsewhere, to deny a prisoner's request for DNA testing does not vitiate his standing to argue that the cited reasons violated his rights under the Due Process Clause."). Plaintiffs are simply wrong that the redressability analysis in these cases is "not limited to procedural violations." Pls.' Br. 23.

At bottom, Plaintiffs seek declaratory relief to "goad" the government to take action. *Juliana*, 947 F.3d at 1175; *see Brackeen*, 599 U.S. at 294. That does not make Plaintiffs' injuries redressable.

62

* * *

As in *Juliana*, Plaintiffs cannot plausibly allege that courts can redress their injuries. The declaratory and injunctive relief they seek fall far short of ameliorating Plaintiffs' climate-change based injures. Relief against the executive orders does not affect the independent power of federal agencies to undertake their actions. And the relief Plaintiffs seek is beyond the judicial power. Instead, Plaintiffs' "case must be made to the political branches or to the electorate at large." *Juliana*, 947 F.3d at 1175.

### D. Plaintiffs' ultra vires claims call for the same redressability analysis.

Plaintiffs' ultra vires claims assert that the executive orders and certain implementing actions violate the Presentment Clause, the Take Care Clause, and separation of powers principles. 6-ER-1319-1335. Plaintiffs are wrong (Pls.' Br. 40-47) that the standing analysis is different for their ultra vires claims.

Plaintiffs cannot fault the district court for not separately analyzing standing for their ultra vires claims (*see* Pls.' Br. 40) when their briefing below did not. *See* SER-27-34. Nor can the district court be criticized for not sifting through Plaintiffs' 126-page Complaint to

63

stumble across some specific implementing action that could properly be subject to injunctive relief. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting that "[j]udges are not like pigs, hunting for truffles buried in the" plaintiff's papers (cleaned up)); *contra* Pls. Br. 45.

Plaintiffs sought a broad injunction to stop the implementation of the executive orders across all the agency defendants. 6-ER1338; SER-28 (plaintiffs characterizing request as "injunctive relief ceasing [Defendants'] implementation" of the executive orders). As explained above, pp.34-44, it was beyond the district court's power to grant that request. It was not the district court's job to do Plaintiffs' work for them and "sort through the noodles" of their "spaghetti approach" to formulate a narrower order. *Washington*, 350 F.3d at 929. Indeed, given the capacious nature of this suit and Plaintiffs' requested relief, targeting individual implementation actions as potentially unlawful would rewrite Plaintiffs' claims.

Plaintiffs assert that three of the executive orders' directives are ultra vires: (1) the President's policy direction that agencies promote hydrocarbons in a manner "consistent with applicable law," (2) the

64

alleged disbanding of the U.S. Global Change Research Program and cancelling of the National Climate Assessment, and (3) the alleged suppression of Plaintiffs' preferred climate science. 6-ER-1319-35. The Court can dispense with the first and third claims easily. The President's overarching policy directives are not justiciable for the reasons already discussed. *See supra* pp.29-62. And even more than the substantive agency decisions that Plaintiffs say will lead to additional "increment[s] of heat" that is insufficient to establish an injury-in-fact, *see supra* pp.19-22, Plaintiffs cannot plausibly allege that the unavailability of some climate science will cause greenhouse gas emissions that injure Plaintiffs.

Plaintiffs also fail to establish standing (*see* Pls.' Br. 46-47) to assert their ultra vires claim about disbanding the U.S. Global Change Research Program and canceling the National Climate Assessment. Those actions do not cause the greenhouse gas emissions that are the sole basis for an injury in fact here and the injunction Plaintiffs seek would, if applied to this claim, do nothing to remedy those injuries. *See supra* pp.19-24; *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) (noting "rule that a remedy must of course be limited to the inadequacy that

65

produced the injury in fact that the plaintiff has established" (cleaned up)). And because the executive orders do not mention the research program or the National Climate Assessment, Plaintiffs' allegations about disbanding the program and cancelling the assessment are not traceable to them. 90 Fed. Reg. at 8359; 90 Fed. Reg. at 15519; 90 Fed. Reg. at 8437.

Separately, though Plaintiffs seem to allude to one, Plaintiffs do not brief a separate informational injury on appeal, and none exists here. An informational injury exists only when a plaintiff is deprived of information that "must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). Though Plaintiffs cite statutes when discussing separation of powers, *e.g.*, 6-ER-1326-27, their claims are based on the Constitution alone, 6-ER-1319; *see* Pls.' Br. 6. The Constitution confers no right to information about the environment, however, and Plaintiffs cannot "ground a claim to standing on an informational injury" without alleging the violation of a statutory right. *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010). Nor do the statutes Plaintiffs cite in passing (Pls.' Br. 46) grant informational standing, because they, at most, require reports for

66

Congress and the President, not Plaintiffs. *See* 15 U.S.C. §§ 2931, 2933, 2936. And the statutes' purpose is to develop a "United States research program," 15 U.S.C. § 2931(b), not to grant "a right to information per se," *Wilderness Soc.* 622 F.3d at 1259.

Even assuming some informational injury, the remedy for an informational injury is disclosure, not a sweeping injunction against the Executive Branch's energy policy. *See Animal Legal Def. Fund v. Dep't of Agric.*, 935 F.3d 858, 868 (9th Cir. 2019) ("informational injuries may be redressed through public disclosure"). If, as Plaintiffs say, the National Climate Assessment is not published in 2027, Pls.' Br. 46, a suit about that deadline could, at most, compel the Assessment's publication. *See* 5 U.S.C. § 706(1). To read between the lines of Plaintiffs' opening brief and conclude that an unbriefed informational injury exists would be to read into existence a separate, categorically more discrete lawsuit.

Finally, Plaintiffs are wrong that "the district court found" that some Plaintiffs "are harmed by the dismissal of researchers and officers necessary for the National Climate Assessment . . . and the loss of other climate data generated and housed by the federal government," which,

67

in turn, they say endangers their lives. Pls.' Br. 10. The district court merely summarized several Plaintiffs' declarations discussing "the dismissal of researchers" and the effects on Plaintiffs' education. 1-ER-15. The only cognizable injury the district court *found* was "increased harm from a warming climate." 1-ER-19; *see supra* pp.19-22. And that injury is not traceable to the executive orders nor redressable in court. Nothing about Plaintiffs' ultra vires claims warrants a contrary conclusion.

## II. Plaintiffs fail to state a claim upon which relief can be granted.

The district court's judgment that it lacked jurisdiction should be affirmed. If this Court disagrees and holds that the district court did have jurisdiction, it should still affirm the complaint's dismissal because it fails to state a claim upon which relief can be granted. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (holding that the Court may affirm on any ground fairly supported by the record). A court should dismiss a complaint under Rule 12(b)(6) if the complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

68

1.    Plaintiffs assert in claims 1 and 2 challenges to the executive orders asserting that they "deprive Plaintiffs of their fundamental rights to liberty" and "life" under the Due Process Clause of the Fifth Amendment. 6-ER-1314-20. Among other problems, there is no fundamental right to a "life-sustaining, stable climate system." 6-ER-1314, 1318.

The Supreme Court has repeatedly instructed courts considering novel due process claims to "exercise the utmost care whenever . . . asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed" into judicial policy preferences. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (cleaned up). And the Supreme Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-21 (quoting *Moore*, 431 U.S. at 503); *see Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022).

Plaintiffs' asserted right to a life-sustaining, stable climate system is "entirely unknown in American law," *Dobbs*, 597 U.S. at 231. No meaningful analogy exists to the distinctly personal and circumscribed

69

right to marry at issue in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), and there is no tradition like marriage at stake here. None of Plaintiffs' other purported (*see* Pls.' Br. 33) precedents fits either—unlike the cases Plaintiffs cite, the climate is a public and generalized issue. *See, e.g.*, *City of New York v. Chevron Corp.*, 993 F.3d 81, 93 (2nd Cir. 2021) (noting that climate change claims interfere with "the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other") (collecting cases). The climate does not implicate personal liberty or personal privacy. *See Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (fundamental right to "freedom from bodily restraint and punishment" "except in accordance with due process of law"); *Vacco v. Quill*, 521 U.S. 793, 807 (1997) ("assumption of a right to refuse treatment" not grounded on "general and abstract right to hasten death," but "on well-established traditional rights to bodily integrity and freedom from unwanted touching"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (noting "the

70

right of the individual" "to acquire useful knowledge" among liberty interests).

2.    Plaintiffs' ultra vires claims fare no better. Each of Plaintiffs' three ultra vires claims is premised on the theory that the executive orders and certain alleged implementing actions "violate the separation of powers and the take care and presentment clauses" of the Constitution. Pls.' Br. 40-41; 6-ER-1319-35. But each claim relies on statutory authorities for this assertion. *See* 6-ER-1319-30 (citing string of statutes), ER-1330 (alleging action "contrary to Congress' mandates"), 1331-35 (citing string of statutes). It is "well established" that "claims that an official exceeded his statutory authority" are distinct from those alleging a "violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994). The former simply "are not 'constitutional' claims." *Id.* at 473.

If that were not enough, ultra vires claims are "strictly limited" and are not available "simply because an agency has arguably reached a conclusion which does not comport with the law." *Nuclear Regal. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Instead, they may be invoked "only when an agency has taken action entirely in excess of its

delegated powers and contrary to *a specific prohibition* in *a statute.*" *Id.*; *see also Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 766 (D.C. Cir. 2022) ("To be ruled ultra vires, the challenged action must contravene a clear and specific statutory mandate, and the statutory construction adopted by an agency will be held impermissible only if it is utterly unreasonable." (cleaned up)). An ultra vires claim is the "Hail Mary" pass of legal arguments and "rarely succeeds." *Nuclear Regal. Comm'n*, 605 U.S. at 681-82. And that is all the more true for Plaintiffs' facial challenges to the executive orders, which must demonstrate that "*no set of circumstances* exists under which the [Executive Orders] would be valid," *Reno v. Flores*, 507 U.S. 292, 301 (1993) (emphasis added). Plaintiffs' allegations amount to mine-run claims of statutory violations, and they identify no specific prohibition in a statute that the executive orders have violated. *See* 6-ER-1319-35. They do not fit the mold for non-statutory ultra vires claims.

3.      Plaintiffs' state-created danger claim suffers the same fate. Generally, the Due Process Clause does not "impose an affirmative obligation on the State" to prevent harms not caused by state action. *DeShaney v. Winnebago County Department of Soc. Services*, 489 U.S.

72

189, 194-95 (1989). This Court has recognized a narrow exception "when [a] state actor affirmatively and with deliberate indifference placed [a] person in danger." *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016). The exception has "limited applicability," and this Court does not often approve its application. *Kennedy v. City of Ridgefield*, 440 F.3d 1091, 1095 (9th Cir. 2006) (Tallman, J., dissenting from denial of rehearing en banc).

Plaintiffs do not plead a plausible claim under the state-created danger exception. To start, the exception applies only when there is a substantive due process right at stake, and there is none here for the reasons already discussed. Even assuming otherwise, the doctrine is far narrower than Plaintiffs conceive: "Every instance" in which this Court has "permitted a state-created danger theory to proceed has [also] involved an act by a government official that created an obvious, immediate, and particularized danger to a specific person known to that official." *Pauluk*, 836 F.3d at 1129-30 (Murguia, J., concurring in part and dissenting in part) (internal quotation marks omitted); *see also id.* at 1130 (collecting cases).

73

Plaintiffs allege none of these elements. 6-ER-1335-1338. A general degradation of the climate is worlds away from the particularized harms recognized in this Court—rape, other physical assault, or death. *E.g.*, *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1129-30 (9th Cir. 2018); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082-83 (9th Cir. 2013). Nor are Plaintiffs' allegations about exacerbating climate change the kind of immediate and particularized action aimed specifically at plaintiffs that this Court has recognized fit the exception. *See, e.g.*, *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1067 (9th Cir. 2006).

Plaintiffs' claims fail as a matter of law and this Court can affirm dismissal on this alternative ground.

## III. The district court did not abuse its discretion in declining leave to amend.

Plaintiffs assert (Pls.' Br. 58) that this Court should separately conclude that the district court erred in declining to allow Plaintiffs to amend their complaint and replead. But Plaintiffs' only argument in support is that they have standing. Pls.' Br. 58. Since that is incorrect, any amendment would be futile. *See Gordon v. City of Oakland*, 627

74

F.3d 1092, 1094 (9th Cir. 2010) ("[L]eave may be denied if amendment of the complaint would be futile."). Plaintiffs propose no "specific allegations that might rectify" their lack of standing, so the district court did not abuse its discretion in declining to allow it. *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

## CONCLUSION

For the foregoing reasons, this Court should affirm.

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

/s/ Jacob D. Ecker
CHRISTOPHER ANDERSON
MICHAEL SAWYER
MIRANDA JENSEN
JOHN K. ADAMS
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov

February 26, 2026
DJ # 90-1-4-17940

75

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-6714

I am the attorney or self-represented party.

**This brief contains 13,993 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Jacob D. Ecker*
**Date** February 26, 2026

76